UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. S1-4:09CR348 CDP |
| ) | |
| MICHAEL WESLEY, et al., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). On October 23, 2009, the Defendant filed a motion to suppress evidence and statements, and a motion to suppress identification testimony. A hearing on the Defendant's motions was held on November 2, 2009. Further, on November 2, 2009, the undersigned ordered a transcript of the evidentiary proceedings, and, after entering an order setting out a briefing schedule, the matter was fully briefed by the parties on December 8, 2009. Based upon the evidence adduced at the hearing on the motion to suppress, a review of the written transcript of the hearing, as well as the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Lyonel Myrthil is a Special Agent with the Federal Bureau of Investigation ("FBI") in St. Louis, Missouri. In March through mid-May, 2009, Myrthil and members of local law enforcement were investigating three similar bank robberies which occurred in the St. Louis area. The three bank robberies were 1) the March 6, 2009 robbery of the Commerce Bank of University City; 2) the March

26, 2009 robbery of the Bank of America in Clayton, Missouri, and 3) the May 11, 2009 robbery of the Regions Bank of Fairview Heights, Illinois.

In March, 2009, Myrthil talked to an informant who was incarcerated in the St. Charles County Jail. The informant told him that on March 10, 2009, four days after the March 6, 2009 bank robbery, Kimberly Clerk, the sister of Defendant Ura Clerk, told the informant that Clerk was identified by members of his family as being involved in the March 6, 2009 bank robbery. The confidential informant also observed bank surveillance photographs from the March 6, 2009 robbery, and identified Clerk as one of the robbers. The informant told Myrthil that the sweatshirt that Clerk was wearing, which was distinctive, actually belonged to the informant. The informant also identified Shamir Houston as one of the other bank robbers in the surveillance photographs, however, could not identify the third bank robber.

After the March 26, 2009 robbery of the Bank of America in Clayton, a second confidential informant talked to Myrthil. This informant told Myrthil that the informant had personally talked to Clerk, who admitted to the informant that he and two other individuals had robbed the Commerce Bank of University City and the Bank of America. He said that Clerk told him that he used his sister's Monte Carlo in going to and getting away from the bank robbery. Myrthil was able to corroborate much of the above information with information from witnesses who identified the Monte Carlo, surveillance photographs from which the defendants were identified, and other documentary evidence such as large cash expenditures made by Clerk.

Based on the above evidence, on or about April 30, 2009, the homes of Clerk and Houston were searched and they were both arrested and charged with the above two bank robberies. Shortly after their arrests and prior to the arrest of Michael Wesley, Clerk and Houston made detailed

2

statements to Myrthil about their roles and the other bank robber's role in the robberies. They began actively cooperating with Myrthil, the FBI, and the United States Attorney's Office. With the information given to Myrthil by Clerk and Houston, he was able to identify Michael Wesley as the third person involved in the bank robberies. Both Clerk and Houston identified Wesley as the person wearing a blue ski mask in the March 6 and 26, 2009 robberies, carrying a gun in his right hand, and going directly to the vault of the bank in order to empty the vault if possible. Clerk was shown a photographic spread which included the photograph of Wesley as well as five other individuals. Clerk positively identified Wesley as the person who robbed the banks with he and Houston. Houston also identified a photograph of Wesley as the person who robbed the banks with he and Clerk. Clerk said that he met Wesley through Shamir Houston, and had been with him on several occasions during the bank robberies. Houston said that he met Wesley at the Casino Queen, and that Wesley lived in Illinois. Clerk said that Wesley was a planner of the bank robberies, and that Wesley had been convicted on prior occasions for bank robbery.

After obtaining this information and determining where Wesley resided, on May 16, 2009, Myrthil made an application to a United States Magistrate Judge to search 3626 Alberta Avenue, Apt. A, in St. Louis, Missouri, the residence of Michael Wesley on that date. In addition to the above material, almost all of which was included in the affidavit, the affidavit also included the following information:

Myrthil told the Magistrate Judge that a cooperating witness, presumably Houston or Clerk, identified a photograph of Michael Wesley as the third bank robber in both of the March robberies. Myrthil was told by the witness that Wesley's intent was to go directly to the vault, and the informant identified surveillance photographs of Wesley armed with a handgun in his right hand, holding a bag

3

and wearing a blue ski mask. A bank surveillance photograph of Wesley is attached to the affidavit. The witness also told Myrthil that after the robbery and the loot being split up at an abandoned house, Wesley was driven to his residence which was in Illinois. As to the March 26, 2009 robbery, the witness said that Wesley was picked up at the Metro Link station in St. Louis, having come from Illinois. The witness also told Myrthil that, on this robbery, it was also Wesley's intent to go directly to the vault and secure the money. The surveillance photographs of this robbery were also attached and showed Wesley leaping over the counter, leading with his left side, with a handgun in his right hand. According to other portions of the affidavit, he is wearing a blue ski mask in both of the robberies. Further, after taking money from the vault, Wesley vaulted back over the counter, leading with his left side. Further, the affidavit also describes the robbery of the Regions Bank of Fairview Heights, Illinois, on May 11, 2009. In the May 11, 2009 robbery, one robber entered the bank, and one other stood at the door. The robber who entered the bank was again wearing a blue ski mask, had a handgun in his right hand, and was carrying a bag. He went to the counter, went over the counter, and went directly to the vault, leading with his left side. When the vault was locked, he took money from the counter and returned over the counter, again leading with his left side. Photographs depicting all of this were attached to the affidavit. Further, as to Clerk's statements that Wesley had been in trouble before, the affidavit states that a review of Wesley's criminal history revealed that he was currently on supervised release in the Eastern District of Missouri, having previously been convicted of five bank robberies. The federal probation officer who Myrthil talked directly to, said that prior to mid-April, 2009, Wesley lived in Illinois, however, he had moved to 3626 Alberta, Apt. A, in St. Louis, Missouri in mid-April. The probation officer conducted a home visit at this location and observed Wesley to be living at that location in mid-April.

Based on the above, the Magistrate Judge issued a warrant to search 3626 Alberta, Apt. A, and to seize U.S. currency, handguns, face masks, ski masks, hats, shoes, gloves, and other articles of clothing and accessories worn during the bank robberies.

After the warrant was obtained, FBI and local police officers set up the surveillance of the Defendant's premises at 3626 Alberta. They observed the Defendant drive up to the house in a Cadillac Brougham automobile, and park down the street from the house. The Defendant was observed getting out of the vehicle, going to the apartment, and entering the apartment. Shortly after the Defendant entered his premises, the agents executed the search warrant. During the execution of the search warrant, the agents seized a blue ski mask, cash with bank wrappers containing tellers' initials securing the cash, and other items of clothing. The agents also looked into the Cadillac automobile that the Defendant was observed driving. When they did so, they observed in plain view three cellular telephones which they believed could be evidence useful to them in the bank robbery prosecution. For this reason, Myrthil applied to a Magistrate Judge for a warrant to search the Cadillac. In support of the warrant, Myrthil submitted an affidavit repeating the details of the above three bank robberies. The affidavit also stated that the agents were able to identify Michael Wesley as the third bank robber by tracing Shamir Houston and Ura Clerk's telephone calls. A cooperating witness (presumably Clerk or Houston) told the agents that they communicated with Wesley, who they knew as "O.G.", by way of cellular telephone in setting up meetings to commit the bank robberies. The agents were able to determine from Houston's cellular telephone records that the phone number on which they contacted Wesley was 618-540-5535. They were able to determine that Wesley had given this telephone number to the US Probation Office as a contact point for his supervised release. The affidavit also states that the agents searched Wesley's home and seized a blue

ski mask, and bundles of cash wrapped in bank wrappers. Prior to the search warrant, the affidavit details that the agents had observed three cellular telephones in plain view inside of the Cadillac. The agents believed that one of the phones was the phone used to facilitate the bank robberies and for Clerk and Houston to contact Wesley. Based on this, the Magistrate Judge issued the warrant to search the vehicle and seize all phones, money, guns, and items of clothing.

When the warrant was executed by Myrthil and other agents, the agents seized the three cellular telephones, a .40 caliber handgun which was found underneath the passenger seat of the vehicle, and a gold watch found in the glove compartment. The gold watch was similar to a gold watch shown in the surveillance photograph of the March 6, 2009 Commerce Bank robbery, and was seized for that reason.

**Conclusions of Law**

<u>Motion to Suppress Evidence</u>

The Defendant alleges that the affidavit in support of the warrant to search 3626 Alberta, Apt. A, is insufficient because there is no probable cause to believe the Defendant had evidence of the bank robbery concealed in his house. He states that neither one of the bank robbery co-defendants have ever been inside the house, and that no one at all had any information that the evidence including the ski mask and the weapon were inside of the house. Therefore, the Defendant states there is nothing to show that any evidence of the crimes of bank robbery were ever concealed at the premises to be searched. Based on the above facts, and the following law, the undersigned concludes that the Defendant's argument must fail.

In the case of <u>United States v. Anderson</u>, 851 F.2d 727 (4th Cir. 1988), a state police officer in Virginia obtained a warrant to search the Defendant's home for a .45 caliber handgun which the

6

officer believed the defendant used in a murder. After the execution of the warrant and the seizure of the gun, the defendant was indicted in federal court with unlawful possession of a firearm and unlawful possession of a silencer for the firearm. In summarizing the affidavit, the Court stated as follows:

> Anderson, on appeal, argues that the search warrant was defective because the affidavit submitted by Mullins to obtain it contained absolutely no facts or conclusions that the pistol and the silencer were located in Anderson's residence. He contends, therefore, there was no probable cause to believe that the pistol and the silencer would be found in the residence. The government argues, on the other hand, that it was reasonable to assume that individuals keep weapons in their homes, particularly in the case of Anderson.

851 F.2d 727, 729.

In holding that the affidavit did state probable cause even though there was nothing in the affidavit to show the gun was in the defendant's home, the Court stated as follows:

> . . .The Fifth, Sixth, Eighth, and Ninth Circuits have held that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence.
>
> . . .We find the holding in Johnson and that of the Fifth, Sixth, Eighth, and Ninth Circuits to be more persuasive. It was reasonable for the magistrate to believe that the defendant's gun and silencer would be found in his residence. Therefore, even though the affidavit contained no facts that the weapons were located in the defendant's trailer, we reject his argument that the warrant was defective.

851 F.2d 727, 729.

In United States v. Steeves, 525 F.2d 33 (8th Cir. 1975), a bank was robbed on June 22, 1974 by a person identified as the defendant, while using a handgun and wearing a ski mask. A warrant was issued by a magistrate judge to search the defendant's home on September 17th of the same year, approximately three months after the commission of the crime. In upholding the warrant against a claim of staleness, the Court stated as follows with particular reference to the gun and the ski mask:

7

> . . .We think that it may be conceded to the defendant that as late as September 17 there was little reason to believe that any of the bank's money or the money bag would still be in the home. But, the same concession cannot be made with respect to the revolver, the ski mask, and the clothing. The ski mask and the clothes were not incriminating in themselves, and apart from his prior felony record possession of a pistol was not unlawful in itself or particularly incriminating. Moreover, people who own pistols generally keep them at home or on their persons. . .

525 F.2d 33, 38.

In United States v. Grossman, 400 F.3d 212 (4th Cir. 2005), the Court upheld a search of a home for drug evidence even though there was no evidence that drugs were stored in the defendant's house. In so holding, the Court stated as follows:

> Our precedent provides guidance in this regard. In United States v. Williams, following a routine traffic stop, officers obtained a search warrant for the defendant's motel room. . .The warrant was issued on the basis of an affidavit which established (1) that Williams had criminal history involving drug trafficking, (2) that his car contained drug residue and concealed a knife, and (3) that he was carrying a receipt for a motel room. . .Williams--like Grossman--argued that this evidence did not establish a probability that drugs would be found in his motel room. He argued that nothing exists to link his past drug related activities to his current motel room. . . We disagreed.
>
> Indeed, our cases indicate that a sufficient nexus can exist between the defendant's criminal conduct and his residence even when the affidavit supporting the warrant "contains no factual assertions directly linking the items sought to the defendant's residence." . . .
>
> The same logic controls here. Under these circumstances, it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key. . .

400 F.3d 212, 217, 218.

Further, in United States v. Burton, 288 F.3d 91 (3rd Cir. 2002), the Court stated that probable cause often is inferred by considering the type of crime, the nature of items sought, the suspect's opportunity for concealment and the normal inferences about where a criminal might hide property. In Burton, the Court found that evidence is likely to be found where drug dealers reside.

Likewise, in United States v. Jenkins, the Court stated the nexus between items to be searched for and the premises searched often is established not as a result of direct evidence, and that evidence that a person normally would be expected to hide at his residence will support a search for stolen property at that residence. United States v. Jenkins, 901 F.2d 1075, 1080, 1081 (11th Cir. 1990). See also, United States v. Rahn, 500 F.2d 305 (10th Cir. 1974); Bastida v. Henderson, 487 F.2d 860 (5th Cir. 1974).

Based on the above, the undersigned concludes that ample probable cause is stated in the affidavit to show that evidence of the bank robbery is likely to be found in the Defendant's premises. The affidavit shows through statements of witnesses that the Defendant robbed a Commerce Bank on March 6, 2009, and the Bank of America of March 26, 2009 while wearing a blue ski mask and carrying a gun. It further shows that immediately after the bank robbery on March 6, 2009, the Defendant was driven to his home in Illinois and dropped off there. Further, the affidavit shows that the Defendant lived at the premises to be searched for at least one month and had been visited there by the probation officer. In addition, agents had observed him getting out of his vehicle, and entering the house presumably with the key just prior to the warrant being executed. Based on the above, the undersigned concludes that, as in Steeves, supra, it is likely that at least the Defendant's belongings--the ski mask, the weapon, and the clothing--could be found in his premises, despite the fact that there was no direct information that the items were at that location, and despite the fact that these bank robberies occurred approximately six weeks before the warrant was executed. In Steeves, the Court noted that the ski mask, revolver, and clothing could be assumed to be in the defendant's residence almost three months after the bank robbery. Moreover, the Court stated that people who own pistols generally keep them at their home. Further, the undersigned concludes that the affidavit

did show probable cause to believe that the Defendant likely robbed the Regions Bank in Fairview Heights just four days prior to the execution of the search warrant, wearing the blue ski mask and carrying a gun. Therefore, in addition to the clothing likely to be found in his house, so was the bounty of his illegal activity. See United States v. Jenkins, supra.

In addition, even if the warrant should be found to lack in probable cause, nevertheless, the good faith exception to the exclusionary rule should apply in this case. In United States v. Martin, 833 F.2d 752 (8th Cir. 1987), the Court stated the standard as follows:

> . . .When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search. However, under certain limited circumstances suppression remains the appropriate remedy. For example, if the magistrate who issued the warrant "wholly abandoned his judicial role," then an officer's reliance on the warrant would be unreasonable. . .Likewise, if the issuing magistrate were misled by the affiant, then suppression is appropriate. *Id.* Further, if the warrant is facially deficient-- i.e., it fails to state with particularity the place to be searched or the thing to be seized--then it can not be reasonably be relied upon. *Id.* The final situation in which suppression is appropriate is at issue in this case because Martin argues that Powers' affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

833 F.2d 752, 755.

Based on the above, the undersigned also concludes that the good faith exception applies. There has been nothing presented in this case to show that the FBI agent misled the magistrate judge or that the magistrate "wholly abandoned" his or her judicial role, or that the warrant is facially deficient. The Defendant's challenge must come, if at all, by alleging that the affidavit is so lacking in indicia of probable cause as to render belief in it entirely unreasonable. However, the undersigned concludes that, based on the above law and facts as stated in Steeves, supra; Jenkins, supra; Anderson, supra, and Burton, supra, the affidavit is anything but bare bones, and in fact, shows probable cause even though there is no information specifically linking the evidence to the premises.

10

In addition, the undersigned notes that "when assessing good faith we can and must look to the totality of circumstances including what [an officer knew] but did not include in his affidavit." United States v. Martin, 833 F.2d 752, 756 (8th Cir. 1987). Therefore, based on the above, the undersigned concludes that the evidence obtained from the warrant to search the premises should not be suppressed.

The Defendant also alleges that there was insufficient probable cause to search the vehicle. Because there was ample probable cause to search the vehicle for cell phones and any other evidence of bank robberies, the Defendant's argument must fail. The affidavit states that agents observed cellular telephones of the variety used by the Defendant in communicating with his fellow perpetrators of the bank robberies. The agents observed these in plain view in the Cadillac vehicle, which they observed the Defendant driving within hours of Myrthil's affidavit to the Magistrate Judge. Similarly, the agents recently discovered proceeds of the bank robberies during the search of the Defendant's house. During the search of the house, the agents discovered cash wrapped in bank wrappers initialed by tellers from the Fairview Heights' bank which had been robbed five days prior to the warrant being issued. In addition, they discovered a ski mask worn by the Defendant, but did not discover the cellular telephone used by the Defendant, nor did they find the pistol used in the robberies. Because the search is of a moving vehicle, probable cause in this matter may be garnered not just from information placed in the affidavit, but from any information within the knowledge of the agents, including the fact that the bank wrappers were initialed by bank tellers of the Fairview Heights bank.

Based on all of the above, the undersigned concludes that it was reasonable for a Magistrate Judge or for the agents to assume that there was at least a "fair probability" that the cellular

telephone, the pistol, or other items of evidence could be found in the Cadillac automobile in any location in which a pistol or cellular telephone might be concealed. This obviously included a glove compartment or under the front seat of the vehicle. See Illinois v. Gates, 462 U.S. 213, 232 (1983); Chambers v. Maroney, 399 U.S. 42 (1970) (moving vehicle doctrine). Therefore, the evidence seized from the vehicle should not be suppressed.

Motion to Suppress Statements

According to the testimony presented at the hearing on the motion to suppress and statements made by the Assistant United States Attorney at the hearing, the Defendant made no statements of any type to the agents immediately after his arrest. The only statements made by the Defendant were pursuant to a proffer agreement and made to the agents by the Defendant with his attorney present. These statements were made evidently some days or weeks after the Defendant's arrest. The proffer agreement was not presented at the hearing before this Court, and the Government stated that it desired to litigate this matter if at all before the trial court if the Government decided to use the proffered statement at the trial. Because of this, the undersigned is not in a position to rule on the motion to suppress at this time, and based on the statements of the prosecutor, will deny the motion to suppress at this time without prejudice to raise this issue at trial should the government attempt to introduce statements made by the Defendant pursuant to the proffer agreement.

Motion to Suppress Identification

In order to prevail on this motion, the Defendant must first show that the identification procedures used by the agents were unnecessarily suggestive. See Stovall v. Denno, 388 U.S. 293 (1967). In the case now at bar, the Government has stated the only two identifications which it will use at trial are the identifications made by the two co-defendants, Ura Clerk and Shamir Houston.

As to Ura Clerk, the evidence at the hearing reveals that Clerk was shown a photographic spread including the Defendant, and photographs of five other males. Clerk identified the Defendant as one of the persons with whom he committed the bank robberies. Houston, evidently, was shown only a single photograph of the Defendant, which he identified. Even if the procedures used by the agents were somewhat suggestive as defined in Stovall, supra, the undersigned concludes that they were not so suggestive as to cause an irreparable mistaken identification. This is so because there is a sufficient independent basis for the identification made by both witnesses.

In the case now at bar, Clerk, using his vehicle, picked up Wesley at the metro station for one of the bank robberies, planned the robbery with Wesley and Houston, robbed the bank, and split up the proceeds after the bank robbery. On a second occasion, Clerk met with Houston and Wesley, planned the bank robbery, and split the bank robbery loot. As to Houston, he met the Defendant at the Casino Queen, met and planned at least two bank robberies with the Defendant, split the proceeds of the bank loot, and dropped him at his home in Illinois. Thus, the undersigned concludes that there was an ample independent basis shown for both of the identifications, and under the totality of the circumstances, the identifications were reliable. Further, the ultimate determination of reliability of identification is almost always a jury question, unless there is "a very substantial likelihood" of a mistaken identification. See United States v. King, 148 F.3d 968, 970, 971 (8th Cir. 1998); United States v. Martinez, 462 F.3d 903, 910, 911 (8th Cir. 2006); Manson v. Brathwaite, 432 U.S. 98 (1977). Given the relationship between the Defendant and his two co-defendants, the undersigned concludes that there is not a "very substantial likelihood of a mistaken identification." This is so even though Clerk and Houston knew the Defendant as "O.G." and not by his real name. Therefore, the identifications should not be suppressed.

## Conclusion

Therefore, the Defendant's motion to suppress evidence should be **denied**, motion to suppress statements should be **denied without prejudice**, and the motion to suppress identification testimony should be **denied**.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Identification Testimony [Doc. #87] be **denied**.

**IT IS FURTHER RECOMMENDED** that the Motion to Suppress Evidence and Statements [Doc. #85] be **denied** as to the motion to suppress evidence, and **denied without prejudice** as to the motion to suppress statements.

Further, the parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

                                                 /s/ Terry I. Adelman  
                                           UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of January, 2010  .